Lake Superior Court, Civil Division Room 7

| | | |
|---|---|---|
| STATE OF INDIANA | ) | LAKE SUPERIOR COURT |
| | ) | |
| COUNTY OF LAKE | ) | 45D10 2 4 0 6 CC 0 6 2 9 0 |
| | ) | Case Number: |
| JORDAN TALLEY-SMITH | ) | |
| 4436 Torrence Ave Hammond, IN. 46327 | ) | **Filed in Clerk's Office** |
| 708-639-0828 | ) | |
| Plaintiff | ) | |
| | ) | JUN 21 2024 |
| v. | ) | |
| | ) | *Michael A. Brown* |
| MISSION LANE LLC. | ) | CLERK LAKE CIRCUIT COURT |
| 1504 Belleville St. Richmond, VA. 23230-4438 | ) | |
| Defendant | ) | |

**COMPLAINT**

Plaintiff, JORDAN TALLEY-SMITH, sues Defendant, MISSION LANE LLC, under Breach of Contract for non-performance and in support thereof states:

1. Plaintiff is a resident of Lake County in the state of Indiana and is authorized to file this Complaint in this Court.

2. Defendant is a business entity registered to do business in the state of Indiana and is subject to this court's jurisdiction.

3. This action exceeds the amount of $75,000 and is being filed in the central court of justice in the superior Court division with the proper venue and jurisdiction.

4. On May 22, 2021, Plaintiff entered an open-end consumer credit plan with Defendant for a line of credit associated with redacted account number #### #### #### 3753. (See attachment labeled Exhibit A) *Contract

5. Plaintiff tendered a negotiable instrument to defendant with Accord and Satisfaction as a performance to the Contract on April 25th, 2024. (See attachment labeled Exhibit B) *Tender of payment

6. Defendant received notice from the Plaintiff instructing them where to transfer the Principal's Balance. (See attachment labeled Exhibit B) *Tender

7.  Defendant refused to carry out fiduciary duties on behalf of the Plaintiff and also refused to carry out the Accord and Satisfaction performance. (See attachment labeled Exhibit C)* USPS Tracking

8.  Due to these acts the Defendant Breached the Contract.

9.  Plaintiff has been deprived of the Goods Proceeds in the Contract sale due to the Defendants negligence to perform.

10. Plaintiff is the owner of the account and seeks to have all rights, titles and interests in the account revested to the owner.

11. Plaintiff also has exhausted all resources attempting to contact Defendant through several means of communication in an effort to resolve the account with Defendant but has been unsuccessful.

12. Defendant willfully neglects to apply the principal's balance owed to the principal's account for set-off. Plaintiff remains willing to negotiate terms to resolve the obligation, although the options may be different than they were prior to the initiation of litigation.

13. The Defendant refuses to return the negotiable instrument back to Plaintiff and the account is taking damage.

14. Defendant owes Plaintiff $807.32 including all interest accrued on the account pursuant to 12 USC 1431.

15. Defendant is in violation of Indiana Civil Code § 5-16-6.5-5 and also United States code 15 USC § 1605.

16. Plaintiff is also seeking to have all unearned interest reverted back to him due to the Breach pursuant to 15 USC 1615. (See attachment labeled Exhibit D) *Past payments

Wherefore the Plaintiff hereby requests from the courts and demands from the Defendant:

1.  Special performance of the Contract or restitution of the parties in the amount of one hundred thirty-six thousand seven hundred twenty dollars and ninety-three cents. ($136,720.93)

2.  That the Defendant be liable for the cost of this action, including reasonable attorney fees.

3.  And anything else the court deems appropriate and just.

Signature: *Jordan Talley-Smith*

45D10 2 4 0 6 CC 0 6 2 9 0    **Filed in Clerk's Office**

## The Mission Lane Visa® Credit Card Issued by
## Transportation Alliance Bank, Inc. dba TAB Bank

JUN 21 2024

**Rates and Fees Table**

*Michael A. Brown*
CLERK LAKE CIRCUIT COURT

| Interest Rates and Interest Charges | |
|---|---|
| **Annual Percentage Rate (APR) for Purchases** | **35.24%** <br> This APR will vary with the market based on the Prime Rate. |
| **APR for Cash Advances** | 35.24% <br> This APR will vary with the market based on the Prime Rate. |
| **Paying Interest** | Your due date is at least 23 days after the close of each billing cycle. We will not charge you any interest on purchases if you pay your New Balance in full by the due date each month. We will begin charging interest on cash advances on the transaction date. |
| **Minimum Interest Charge** | If you are charged interest, the charge will be no less than **$0.50**. |
| **For Credit Card Tips from the Consumer Financial Protection Bureau** | To learn more about factors to consider when applying for or using a credit card, check out the website of the Consumer Financial Protection Bureau at http://www.consumerfinance.gov/learnmore. |

| Fees | |
|---|---|
| **Annual Fee** | **Note:** This annual fee is applied to your account at the end of the first billing cycle in which you make a transaction and will reduce the amount of credit you initially have available. For example, if you are assigned the minimum credit limit of $200, your initial available credit will be only about $141. You may still reject this plan, provided that you have not yet used the account or paid a fee after receiving a billing statement. If you do reject the plan, you are not responsible for any fees or charges. <br><br> **$59** |
| **Transaction Fee** <br> Cash Advance | Either **$5** or **8%** of the amount of each cash advance, whichever is greater. |
| **Transaction Fee** <br> Foreign Transaction | **3%** of each transaction in U.S. dollars |
| **Penalty Fees** <br> Late Payment | Up to **$35**. |

**How Will We Calculate Your Balance:** We use a method called "Daily Balance (including new transactions)." See your Card Agreement below for more details.

**Billing Rights:** Information about your rights to dispute transactions and how to exercise those rights is provided in your Card Agreement below.

**Additional Rate Information:** A variable APR may change quarterly. The variable APR is determined by adding a margin of 26.74% for Purchases and 26.74% for Cash Advances to the Prime Rate. The Prime Rate used to determine a variable APR for the Billing Cycle is the highest rate of interest listed as the U.S. Prime Rate in the Money Rates section of the online Wall Street Journal (www.wsj.com) as of the 26th day of the calendar months of March, June, September, and December. If the Prime Rate has changed, the new rates will take effect **on the first day of** the first Billing Cycle that starts after the change. Any increase in the Prime Rate may increase your interest charges and your Minimum Payment Due. Your daily periodic rate for Purchases is 0.09655%. Your daily periodic rate for Cash Advances is 0.09655%. The variable APRs are as of 09/26/2023, based on a Prime Rate of 8.50%.

# THE MISSION LANE VISA®
# CREDIT CARD AGREEMENT

Welcome to your Mission Lane Visa® Credit Card Account. Please read this Agreement and keep a copy for your records. Let's get started!

## 1. Definitions

**Account** means your Mission Lane Visa® Credit Card account with Transportation Alliance Bank, Inc. dba TAB Bank. Your account is issued by Transportation Alliance Bank, Inc. dba TAB Bank, Ogden, UT, pursuant to a license from Visa U.S.A. Inc. TAB Bank is the creditor and card issuer.

**Agreement** means this document, including the Rates and Fees Table and other documents or disclosures incorporated by reference.

**Billing Cycle** means the period of time between two statement closing dates for your Account.

**Card** means any Transportation Alliance Bank, Inc. dba TAB Bank card or other device (including your Account number) used to access your Account to obtain credit.

**Cash Advance**, if offered, means the use of your Account for:

- Obtaining cash from participating ATMs, financial institutions, or other locations; and
- Cash-like transactions, such as online gambling; peer to peer transfers; making a payment on a loan; making a payment using a third party service; or purchases of foreign currency, cryptocurrency, money orders, wire transfers, travelers' checks, lottery tickets, casino gaming chips (physical or digital), wagers, or other similar items.

**Purchase** means the use of your Account to buy or lease goods or services at participating merchants. Cash Advances are not considered Purchases.

**Rates and Fees Table** means the document entitled "Rates and Fees Table," which lists the APRs that apply to your Account and other important information.

**Transaction Date** means the date shown on your billing statement for a transaction or fee.

**We, Us,** and **Our** refer to Transportation Alliance Bank, Inc. dba TAB Bank, the issuer of your Card.

**You, Your,** or **Yours** refer to you (the applicant for the Account), and any other person(s) responsible for complying with this Agreement.

Capitalized terms not defined here commonly refer to terms used on your Account billing statement.

## 2. Your Agreement with Us

By using, or permitting others to use, your Card or Account, you are agreeing to be bound by this Agreement. Even if you do not use your Card or Account, this Agreement will take effect unless you contact us to cancel your Account within 30 days after we sent you the Card.

**This Agreement includes an Arbitration Agreement. If there is a dispute between you and us, the dispute is covered by the Arbitration Agreement, then either you or we may require the dispute to be resolved by**

will not have the right to a jury or court trial to resolve the dispute; and (3) you and us will not have the right to pursue a claim as a class action. You have the right to reject the "Arbitration Agreement with Class Action and Jury Trial Waiver" as explained in that section.

## 3. Military Borrowers

---

**Statement of MAPR:** Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent(s) may not exceed an Annual Percentage Rate of thirty-six percent (36%). This rate must include, as applicable to the credit transaction or account the costs associated with credit insurance premiums; fees for ancillary products sold in connection with the credit transaction; any application fee charged (other than certain application fees for specified credit transactions or accounts); and any participation fee charged (other than certain participation fees for a credit card account).

**Oral Disclosures:** Before agreeing to this Agreement, please call (844) 885-2921, anytime 24/7, to hear an important disclosure for Covered Borrowers (as defined below) and information about the payment obligation relating to an Account.

**Military Lending Act Compliance:** This Agreement shall be interpreted to comply with the Military Lending Act and its implementing regulations ("MLA"), including its restrictions on permissible loan terms and limitations on interest and fees. A consumer becomes a "Covered Borrower" who is entitled to the Limitations on Terms of Consumer Credit Extended to Service Members and Dependents pursuant to a determination made in accordance with 32 C.F.R. 232.5(b). The Arbitration Agreement with Class Action and Jury Trial Waiver does not apply to a Covered Borrower. The limitations on interest and fees apply to individuals during the period that they are Covered Borrowers (a consumer ceases to be a Covered Borrower when he or she is no longer a member of the Armed Forces serving on active duty or a dependent of such member, as defined under 32 C.F.R. 232.3(g).) Any interest or fees in excess of the permitted limit shall be reduced by the amount necessary to satisfy that limit and any amounts collected in excess of the permitted limit shall be refunded by crediting the Covered Borrower's Account or by making a direct payment to the Covered Borrower. Any provision of this Agreement that is inconsistent with the Military Lending Act shall not apply.

## 4. Your Account

---

**You have the following responsibilities related to your Account:**

- You can only use your Account for personal, family, or household purposes. You **can't** use your Account for business, online gambling, or illegal purposes. If you do:
  - We may block such transactions and/or terminate your Account
  - You'll be in default under this Agreement
  - You'll have to pay us for those transactions and all other transactions on your Account at the time it's closed, as well as any damages and/or expenses resulting from that prohibited use.
- At our discretion, you may use your Account to receive Cash Advance(s) from us, as well as to take advantage of other features of the Card as allowed in your Agreement. You may not use your Account in any way, including Cash Advances, to pay your Account or any other form of credit account you may have with us.
- Sign your Card immediately once you receive it.
- Return the Card to us or destroy it if we ask you to.
- Take reasonable steps to protect your Account and prevent the unauthorized use of your Card, Account, Account Information and/or information enabling Account access, any device you use to access and/or use your Account (including digital wallets).

We may decline a transaction at our sole discretion, even if the transaction wouldn't cause your Account to go over your credit limit or your Account isn't in default. We will not be liable to you if we decline a transaction, or if anyone refuses to accept your Card for any reason. We're also not responsible for any losses that you may incur if/when our services are unavailable due to factors beyond our control.

**Credit Limit**
We assign a credit limit to your Account, which is the dollar amount of credit available to borrow on your Account. We may allow you to use a portion of the credit limit for Cash Advances. We tell you these credit limits at Account opening and as stated on your credit card mailer. We may refer to your credit limits as "credit lines." There may be a limit on the amount of Cash Advances you can take in a given time period. We may increase or decrease your Account credit limit or your Cash Advance credit limit without notice.

cause your balance to exceed your credit limit. If we do, these transactions won't increase your credit limit. You're responsible for paying these transactions. We may also increase, decrease, restrict, or cancel your credit limit for any particular Balance at any time at our discretion. These actions don't impact your obligation to repay your Account.

**Promise to Pay**
You promise to pay us for all amounts charged to the Account or due under this Agreement, including all transactions, interest or fees, and other charges. You're obligated to repay us for all transactions made by you and /or by other people you have allowed to use the Card, even if their use of the Card exceeds the authorization you gave them, the Card is not present, the transaction wasn't signed for, or the transaction was made using a mobile wallet.

**Using a PIN**
We may assign you a Personal Identification Number (PIN) for Cash Advances. You **won't** need it for Purchases. Keep your PIN secure. Don't write it down, give it to anyone, or keep it with your Card. If you lose your Card or believe the confidentiality of your PIN has been compromised in any way, please reach out to us immediately. We'll be happy to help secure your Account.

## 5. Interest Charges and Fees

As disclosed in the Rates and Fees Table above we'll charge interest and fees to your Account.

**Interest Rates:** We use daily periodic rates and corresponding APRs to determine the interest charged on balances on your Account. A daily periodic rate is the corresponding APR divided by the number of days in the year (generally 365, but 366 in a leap year). Information on the daily periodic rates and APRs may be found at the bottom of the Rates and Fees Table.

**How We Calculate Interest:** We use the daily balance method (including new transactions), which includes daily compounding of interest, to calculate interest on your Account. We calculate interest charges each Billing Cycle by first figuring the "daily balance" for each "Balance". A "Balance" is a group of transactions that are subject to the same terms. Your Balances will be reflected on your periodic statement, if one is sent to you. To get the daily balance for a Balance, we start with the ending balance for the prior day. We add any new transactions and fees as of the later of the Transaction Date or the first day of the Billing Cycle in which the transaction or fee posted to your Account. We add Cash Advance fees to the applicable Cash Advance Balance. We add all other fees to the standard Purchase Balance. We subtract any new credits and payments. We make other adjustments (including those adjustments required in the grace period section). We multiply the daily balance for each Balance each day by its daily periodic rate and add that amount to that day's balance to get the ending balance. (Any daily balance that is a credit balance is treated as zero.) We do this for each day in the Billing Cycle. The sum of the daily interest charges for all the Balances is the total interest charge for the Billing Cycle. Due to rounding or minimum interest charge, the interest calculation may vary from the interest charge actually assessed.

**When Interest Charges Begin:** Interest charges begin to accrue on Purchases and Cash Advances from the later of the Transaction Date or the first day of the Billing Cycle in which the transaction posts to your Account, and accrue on interest and fees from the Post Date. Interest charges continue to accrue until you pay in full. If offered, the terms for a promotional offer will be provided with the promotion prior to the transaction and those terms shall govern with respect to that particular Balance.

**How to Avoid Paying Interest on Purchases:** As long as you pay the New Balance on your current billing statement by the Payment Due Date shown on that billing statement, we will not impose interest charges on New Purchases (also known as the "grace period"). New Purchases are Purchases that first appear on the next billing statement. Interest will continue to accrue each day on Purchases that appeared on previous billing statements until you pay the New Balance in full and will be billed in the next Billing Cycle. There is no grace period on Cash Advances. If interest is accruing on a Cash Advance balance, even if you pay your New Balance in full, you will owe interest the following month. This is because interest continues to accrue from the start of the Billing Cycle until the day we receive your payment.

**How We Apply Payments May Impact Your Grace Period:** If you do not pay your New Balance in full each month, then, depending on the balance to which we apply your payment, you may not get a grace period on new Purchases.

**Fees**
The Fees disclosed to you in the Rates and Fees table above are generally considered Purchases once charged to your Account, unless it is a Cash Advance fee or as otherwise specified. We may increase interest charges or Fees

**Annual Fee:** If your Account includes an Annual Fee, the fee will be added to your standard Purchase Segment on the last day of the Billing Cycle in which you first use your Account and annually thereafter until your Account is closed and the balance is paid in full (even if you don't use the Account or if you don't have active charging privileges).

**Late Payment Fee:** If we don't receive at least the Minimum Payment due on your Account by the Payment Due Date, we may charge you a Late Payment Fee. The Late Payment Fee will be $25.00 if you did not incur a Late Payment Fee during any of the prior six Billing Cycles; otherwise the Late Payment Fee will be $35.00. This fee will never exceed the Minimum Payment Due that was due immediately prior to the date on which the fee was assessed.

**Returned Payment Fee:** If the payment you offer to us is not honored, is returned unpaid, or cannot be processed, we may charge you a Returned Payment Fee even if the payment is honored after we re-submit it. The Returned Payment Fee will be $30.00 if you did not incur a Returned Payment Fee during any of the prior six Billing Cycles; otherwise, the Returned Payment Fee will be $40.00. This fee will never exceed the Minimum Payment that was due immediately prior to the date on which the payment was returned to us.

**Cash Advance Fee:** For each Cash Advance, we may charge a fee as stated in the Rates and Fees Table. The Cash Advance Fee will be added to your Cash Advance Balance.

**Foreign Currency Conversion:** If a Purchase or Cash Advance is made in a currency other than U.S. dollars, the transaction will be converted by the network (e.g. Visa) shown on your Card into a U.S. dollar amount in accordance with the network's operating regulations or conversion procedures in effect at the time the transaction is processed. The currency conversion rate in effect on the processing date may differ from the rate in effect on the Transaction Date or posting date. If a third party, such as a merchant or ATM operator, converts the transaction into U.S. dollars before sending the transaction to the network, the third party chooses the conversion rate instead of the network. An ATM operator might also add a fee to the ATM transaction amount for the ATM transaction(s) they process. We do not have control over third party conversions or fees.

**Foreign Transaction Fee:** We apply a fee to any foreign transaction in the amount shown on the Rates and Fees Table. A transaction is a "foreign transaction" if it is (1) made in a currency other than U.S. dollars or (2) made or processed in whole or in part outside of the United States. For example, a Purchase is a foreign transaction if it is made online with a merchant that processes the transaction in a foreign country, and an ATM transaction in a foreign country is a foreign transaction even if the transaction is made in U.S. dollars.

# 6. Payments

You may pay all or part of your Account balance at any time.

**Minimum Payment:** Each Billing Cycle, you must pay at least the Minimum Payment by the Payment Due date and cut-off time shown on your statement ("Payment Due Date"). Your "Minimum Payment" is equal to the greater of (i) $25, or (ii) 1% of your New Balance, rounded to the next highest dollar, plus any fees assessed during the Billing Cycle (excluding any annual fee), plus new interest charges, and plus any past-due amounts. If your New Balance is less than $25, your Minimum Payment will equal the amount of your New Balance.

Your statement will tell you your Minimum Payment due, your New Balance, and your Payment Due Date. You must make your payment in accordance with the instructions on the statement.

If you make a payment greater than your Minimum Payment, you're still obligated to pay at least your Minimum Payment on your next statement by the Payment Due Date on that statement. Credits to your Account, such as from merchants, are generally not considered payments and won't reduce your Minimum Payment due.

**Making Payments:** You must make your payment in U.S. dollars from a U.S. deposit account in a form acceptable to us. We do not accept cash payments. At our discretion, we may accept payments in another form of currency and charge you our conversion costs. You also may not make payments with funds from your Account or any other credit account with us. Please follow the payment instructions on your statement, unless we tell you otherwise.

**Other Payment Services:** We encourage you to schedule automated recurring payments. We also may make services available that allow you to make faster payments either by phone or through your online dashboard. We are not responsible if your financial institutions reject payments made using one of these services.

If someone else makes a payment on your behalf, we may be able to process that third-party payment. We also may refuse to accept that payment. If we do accept it, you're responsible for the payment regardless of it being returned or rejected.

**Payment Allocation:** We'll apply credits or payments you make toward Account balances **up to the amount of your Minimum Payment** at our discretion, including in a manner most favorable or convenient for us. In all cases, including with respect to amounts in excess of your Minimum Payment, we will apply payments and credits in accordance with applicable law.

**Payment Processing: We may accept all payments-including late payments, partial payments, or items with restrictive language-at our discretion and without losing any of our rights.** We may delay the availability of credit to your Account for up to 10 days until we confirm that your payment has cleared, even if we post your payment to your Account. If your payment is returned by your financial institution, we may resubmit and collect the returned payment electronically. If necessary, we may adjust your Account to correct errors, process returned or reversed payments, and more.

**Credit Balances:** We may reject and return any payment to you that creates or adds to a credit balance on your Account. We may reduce the amount of any credit balance by any new charges.

## 7. Credit Reporting

You authorize us to obtain and use credit, income, employment, or other information about you from consumer-reporting agencies and others, for any legitimate purpose, including extending credit, servicing, the ongoing review or collection of your Account, or to consider you for other products and services, as permitted by law. We may report information about you and your Account to credit reporting agencies. We normally report to credit reporting agencies each month. Late payments, missed payments, or other defaults on the Account may be shown in your credit report. Tell us if you think we reported wrong information about you by writing to us at Mission Lane LLC, Attn: Credit Reporting, P.O. Box 105286, Atlanta, GA 30348 or call us at 855-790-8860. Tell us what information is wrong and why you think it is wrong. If you have a copy of the credit report that includes the wrong information, please send us a copy.

## 8. Privacy and Communications

**Customer Privacy and Information Sharing:** When you applied for an Account, you gave permission for your personal information to be shared, including for purposes other than the servicing of the Account, such as offering you special benefits or other products and services by us or others. More information about how information about you is shared is set forth in the Privacy Notices for your Account.

**Contact Information:** You agree to promptly notify us when your contact information changes. We may ask you for additional information and/or documentation to verify any information you provide to us. We may restrict or close your Account if we can't verify your information, or if you can't provide certain information that we may request.

**Communications:** You agree that we (including any companies working on our behalf to service your Account) may contact you, including calls, text message(s), or email, at any phone number, email address, text number or mailing address you provide to us, from which you contacted us, or we receive and believe we can reach you at, to the extent permitted by applicable law, including for purposes of collections. When you give us your phone number, you agree that we (including any companies working on our behalf to service your Account) have your explicit permission and consent authorizing us to contact you at that number, subject to your privacy preferences. Your consent allows us (including any companies working on our behalf to service your Account) to use text messaging, automatic phone dialing systems, artificial or prerecorded voice message systems, and automated texting and email technology, even if you are charged message and data rates for the calls and texts. Automated messages may be played when the telephone is answered, whether by you or someone else. You may contact us at any time to review your preferences or advise that you no longer wish to be contacted on your cell phone, email, or by text. You are responsible for the actions taken on your Account by anyone to whom you have provided shared access to your Account. Where allowed by law, we (including any companies working on our behalf to service your Account) also may contact other individuals who may be able to provide updated employment, location, and/or contact information for you. You agree that we may listen to and record your phone calls with us, and may use your voice recordings for verification purposes. Note: The express consent in this provision includes and extends to any affiliates, agents, contractors, representatives, servicers, service providers, or subsequent owner of your Account.

You must send any notices to Mission Lane LLC, P.O. Box 105286, Atlanta, GA 30348, Attn: Notice ("Notice Address"). To the extent permitted under applicable law, any notice you send us won't be effective until we receive it and have had a reasonable opportunity to act on it.

## 9. Other Important Information

**Default:** We may require immediate payment of your total Account balance, to the extent allowed by law, if **any** of the following occur:

1. You fail to comply with the terms of this Agreement or other agreements relating to your Account, including failing to make a required minimum payment when due, exceeding your Account credit limit or using your Card or Account for an illegal transaction;
2. You make a payment that's not honored for any reason;
3. You file for bankruptcy or some other insolvency proceeding is filed by or against you;
4. We reasonably believe you may be unable or unwilling to pay your debts as agreed, including if you're declared incompetent, incapacitated, or deceased;
5. You breach any term under this Agreement;
6. We determine that any statement made by you to us, including through any service provider, in connection with this Agreement or your Account was false, misleading, or attempted fraud; or
7. You no longer live permanently in the U.S.

**In accordance with applicable law, if your Account is in default, we may:**

1. Close or suspend your Account without notice (unless as applicable law requires otherwise);
2. Require you to pay your unpaid balance immediately;
3. Continue to charge you interest and fees (as previously disclosed) as long as your Account has a balance; and/or
4. Attempt to collect or pursue other actions permitted by law.

**Collection Proceedings:** If we use an attorney to collect your Account, we may charge you our legal costs as permitted by law. These include reasonable attorneys' fees, court or other collection costs, and fees and costs of any appeal.

**Closing Your Account:** You may close your Account at any time to by contacting us at 855-790-8860 or support@missionlane.com. We may close or suspend your Account at our discretion at any time. If the Account is closed, you must stop using it and destroy the Card(s). You must still pay us all amounts you owe—even for transactions that post to your Account after it's been closed or suspended - and the Agreement remains in effect until you pay the outstanding balance. We may cancel your current Card and issue you a substitute Card at any time.

If you ask us to close your Account but there is continued use of your Account after the date of cancellation (such as automatic payments or subscriptions), we'll consider the continued use as your request for reinstatement of your Account. We may then reinstate your Account under the same terms.

**Governing Law:** The terms and enforcement of this Agreement are governed by federal law, and to the extent not preempted by federal law, the laws of Utah, regardless of any conflict of laws principles. The Federal Arbitration Act will govern any arbitration related to this Account and not any state law.

**Waiver:** We may delay enforcing or not enforce any of our rights under this Agreement without losing or waiving any of them.

**Assignment:** We may assign, transfer, or sell your Account or any portion of it without notifying you. You may not assign, transfer, or sell your Account without first obtaining our written consent.

**Change of Terms:** We may change, add, or remove provisions of this Agreement for any reason and at any time, subject to applicable law. These changes may apply to existing and future balances on your Account, to the extent permitted under applicable law. We'll give you notice of any change. A change with advance written notice may include a right to reject the change(s), including if required by law. We may require you to close your Account or take other actions if you reject the changes.

**Severability:** Subject to the Arbitration Agreement: (1) if any part of this Agreement conflicts with applicable law,

**Events Outside of Our Control:** Sometimes our services may be unavailable due to factors beyond our control, and you may not always be able to use your Card or get information about your Account. We're not liable when this happens.

**Lost or Stolen Card:** You agree to notify us right away if you believe that your Card has been lost or stolen, or if your Account is being used without your permission. You agree to assist us with our investigation.

**Merchant Disputes:** If you have a dispute with a merchant, you may request a credit to your Account. If we resolve the dispute in your favor, we will issue a credit to your Account. You assign to us your claim for the credited amount against the merchant and/or any third party. At our request, you agree to provide this assignment in writing.

**Automatic Account Information Updates:** You may set up automatic billing or store your Account information with a merchant, wallet provider, or other third party ("Permitted Party"). If you do, you authorize us to share your Account information, with the Permitted Party, regarding the use of your Account. If your Account information changes, which may include your billing address, you authorize us to provide this updated information to any such Permitted Party at our discretion. You must contact the Permitted Party directly or remove your credit card information from the Permitted Party website if you wish to stop automatic billing or Account updates.

## 10. Arbitration Agreement with Class Action and Jury Trial Waiver

**PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY AS IT WILL HAVE A SUBSTANTIAL EFFECT ON YOUR RIGHTS IN THE EVENT OF A DISPUTE, UNLESS YOU PROMPTLY REJECT IT AS PROVIDED IN SECTION L BELOW.**

**THIS ARBITRATION AGREEMENT DOES NOT APPLY IF, AS OF THE DATE OF THIS AGREEMENT, YOU ARE A MEMBER OF THE ARMED FORCES OR A DEPENDENT OF SUCH A MEMBER COVERED UNDER THE MILITARY LENDING ACT.**

For purposes of this Arbitration Agreement and Class Action and Jury Trial Waiver ("Arbitration Agreement"), the terms "we", "us" and "our" means Transportation Alliance Bank, Inc. dba TAB Bank, Ogden, UT, Mission Lane, and their affiliates, and/or any other holder (as defined in Section a. below) or person or entity named as a co-Defendant in a Claim made by you related to this Agreement or any interest in or receivable arising under your Account.

Either you or we may agree to resolve our differences by binding Arbitration.

**a. Agreement to Arbitrate Disputes:** Maintaining healthy relationships with our members is very important to us. If you have a problem with your Account or a service we provide, please let us know as soon as you can. Giving us a call helps to resolve the matter quickly. Regardless, except as stated below, any unresolved Claim will be resolved through final and binding arbitration as set forth in this section, subject to the opt out pursuant to section l. below. Either you, we, or any beneficiary of this Arbitration Agreement also may elect to arbitrate any Claim pursuant to this Arbitration Agreement.

**b. Claim:** A "Claim" under this section is any unresolved claim, dispute, or controversy between you and us whether past, present or future, arising out of or related to this Agreement, your Account, products or services governed by this Agreement or the relationships resulting from this Agreement or your Account. A "Claim" includes disputes concerning the validity or enforceability of this Arbitration Agreement. "Claim" has the broadest possible meaning and includes initial claims, counterclaims, cross-claims, and third-party claims whether based upon contract; tort; fraud; a constitution, statute, regulation, ordinance, common law, and/or equity (including any claim for injunctive or declaratory relief); or otherwise. Notwithstanding the foregoing, Claim does not include Public Injunctive Relief Requests or any individual actions brought in small claims court (or your state's equivalent court, if any). If the aforementioned individual action is transferred, removed, or appealed to a different court, it'll be eligible for arbitration at either party's request. The bringing and/or maintenance of any such action shall not be a waiver of rights of any party to compel arbitration of any other Claim subject to this Arbitration Agreement.

**The Process**

**c. Notice of a Claim:** Before starting a lawsuit or arbitration, the party electing to commence a proceeding must give the other party written notice of the Claim. The notice must include: (1) the name, telephone number, mailing address, and email address of the party seeking arbitration; (2) the Account number at issue; (3) reasonable detail of the Claim, including supporting facts; (4) the remedy sought and a good-faith calculation of the amount in controversy, expressed in United States Dollars; and (5) the original signature of the party making a Claim. You must send the notice in writing to Mission Lane LLC, P.O. Box 105286, Atlanta, GA 30348, Attn: Legal - Arbitration Election. If we intend to make a Claim, we'll notify you in writing at the most recent address we have for you in our files. The complaining party must give the other party a reasonable opportunity over the 30 days after notice is sent to resolve the Claim.

**d. Commencing Arbitration:** If the parties do not reach agreement to resolve the Claim within 30 days after notice is sent, the complaining party may initiate arbitration by submitting a demand for arbitration to the Arbitration Administrator at the address listed in Section e. below, subject to the terms of this Arbitration Agreement and the arbitration company's rules. If one party files or threatens a lawsuit, or files a counterclaim or motion to convert an individual action to a class action in an existing lawsuit, the other party may demand arbitration, including in a motion to compel arbitration. If the motion to compel arbitration is granted, the party prosecuting the Claim will be responsible to commence arbitration pursuant to the terms of this Arbitration Agreement and the arbitration administrator's rules. If either party fails to submit to binding arbitration following a lawful demand, the party who fails to submit will bear all costs and expenses incurred by the party compelling arbitration.

**e. Governing Law and Arbitration Administrator:** This Arbitration Agreement is governed by the Federal Arbitration Act ("FAA"), and not by any state arbitration law. Each arbitration, including the selection of the arbitrator, will be administered by the American Arbitration Association ("AAA")(the "Arbitration Administrator"), according to

copy of the AAA procedures, demands for arbitration, and any question about the AAA must be sent to: American Arbitration Association, 1633 Broadway 10th Floor, New York, NY 10019. You may also visit them online at www. adr.org. If the AAA is unavailable, and you and we can't agree on a replacement, then you or we may ask a court with jurisdiction to select the substitute arbitration administrator. A single arbitrator will be appointed. All arbitrators must be practicing attorneys or retired judges and experienced and knowledgeable in the substantive laws applicable to the Claim.

**f. Fees and Costs:** If you can't obtain a waiver of the AAA's or arbitrator's filing, administrative, hearing, and/or other fees, we'll agree upon request to cover these fees up to one thousand five hundred dollars ($1500) unless the arbitration administrator decides that its rules or law require that our share of fees and costs be more. Requests for fee reimbursements should be sent to: Mission Lane LLC, P.O. Box 105286, Atlanta, GA 30348, Attn: Legal - Arbitration Election. Each party will bear the expense of its own attorneys, experts, and witnesses, regardless of which party prevails unless the arbitrator decides, based on applicable law, the rules of the AAA, or this Agreement, that the prevailing party has a right to recover any of those fees or costs from the other party.

**g. Arbitration Hearings and Decisions:** Unless otherwise agreed by you and us, arbitration hearings will take place in a location that's reasonably convenient for you. The arbitrator will follow applicable substantive law, except if contradicted by the FAA; follow applicable statutes of limitations; honor valid privilege Claims; issue a written decision; and, upon timely request of any party, write a brief explanation of the basis of the award.

The following provisions will apply to all arbitrations between the Parties under this Agreement: (1) timely filed offers of judgment under Federal Rule of Civil Procedure 68 or any state equivalent will be honored and require the party that declined to offer to pay the costs and fees of the filing party if the decision obtained is not more favorable than the unaccepted offer; (2) the arbitrator must apply state or federal substantive law applicable to the Claim(s) and may not be permitted to award any remedy that exceeds that which a court could award for the Claim(s); (3) a finding that a Claim or counterclaim is frivolous or intended to harass will entitle the other party to recover their attorney's fees, costs and expenses; (4) the arbitrator shall not be bound by prior, separate arbitration decisions; and (5) failure or forbearance to enforce this Arbitration Agreement at any particular time or in connection with any particular Claims won't constitute a waiver of any rights to require arbitration at a later time or in connection with any other Claims. Either party may seek to enjoin the arbitration proceeding in court with jurisdiction and the arbitration will be automatically stayed pending the outcome of that proceeding.

The arbitrator's award will be final and binding, except for any appeal right under the FAA. Any court with jurisdiction may enter judgment upon the arbitrator's award. Notwithstanding the above, in the event that an award involves a cost or benefit to any party for more than $100,000 or involves injunctive relief, any party may appeal the award to a three-arbitrator panel of the Arbitration Administrator, provided the appeal is filed within 30 days of the original award. The panel may accept or reject any or all of the original award and any decision of the panel must be by majority vote. The appealing party must pay all costs unless the panel decides otherwise.

**h. Jury Trial Waiver:** YOU AND WE KNOWINGLY, VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY AGREE AND UNDERSTAND THAT YOU AND WE ARE GIVING UP THE RIGHT TO TRIAL BY JURY OF ANY LITIGATION ARISING OUT OF THE AGREEMENT, RELATED TO YOUR ACCOUNT, OR ANY OTHER DISPUTE ON CONTROVERSY BETWEEN YOU AND US.

**i. Public Injunctive Relief Requests:** If you or we seek public injunctive relief as a remedy for any Claim (a "Public Injunctive Relief Request") you and we agree that the Public Injunctive Relief Request cannot be arbitrated. Instead, that Public Injunctive Relief Request shall be adjudicated by a court after all other Claims to be decided in arbitration under this Arbitration Agreement are resolved in arbitration, including all causes of action pursuant to which a Public Injunctive Relief Request is made. You and we agree to jointly request that the court stay the Public Injunctive Relief Request until after the remaining Claims have been finally resolved in arbitration, and that the parties will only seek to lift the stay and request that the court resolve the Public Injunctive Relief Request if an arbitrator finds that one of them is liable for a Claim for which public injunctive relief is an available remedy. The validity, enforceability, and effect of this section shall be determined exclusively by a court, and not by any arbitration administrator or arbitrator.

**j. Class Action Waiver:** TO THE EXTENT PERMITTED BY APPLICABLE LAW, YOU AGREE THAT ANY CLAIM ARISING OUT OF THE AGREEMENT, RELATED TO YOUR ACCOUNT, OR ANY OTHER DISPUTE OR CONTROVERSY BETWEEN YOU AND US WILL PROCEED ON AN INDIVIDUAL BASIS AND WILL NOT PROCEED AS PART OF A CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL ACTION IN COURT OR ARBITRATION. If a court determines that section j's limits on a particular Claim is not fully enforceable, then, only after all appeals have been unsuccessfully made, (1) that Claim will be severed from arbitration and must be brought in court and (2) this paragraph otherwise will remain in force.

**k. Survival and Severability of Terms:** This Arbitration Agreement shall survive: (1) termination or changes in the Agreement, the Account, or the relationship between you and us concerning the Account; (2) the bankruptcy of any party; and (3) any transfer, sale or assignment of your Account or this Agreement, or any interest in or any amounts

**I. RIGHT TO OPT OUT: You may opt out of this Arbitration Agreement by mailing a signed opt out notice to Mission Lane LLC, P.O. Box 105286, Atlanta, GA 30348, Attn: Arbitration Rejection Notice, which is received at the noted address within sixty (60) calendar days of the date you applied for your Account.** The opt out notice must include your name, address, email address, phone number, your Account number, a statement of your rejection of this Arbitration Agreement, and your signature. Rejecting arbitration won't affect your other rights or responsibilities under this Agreement nor will it constitute rejection of any prior or future arbitration agreement between you and us regarding any other product and/or service.

# 11. State Notices

**All Accounts, including California and Utah Residents:** As required by law, you're hereby notified that we may submit a negative credit report to a credit-reporting agency if you fail to fulfill the terms of your credit obligations, which may reflect on your credit profile.

**Arizona:** Mission Lane LLC does business in Arizona under the trade name Mission Lane Card Services LLC.

**California:** A married applicant may apply for a separate account. After approval, each applicant will have the right to use this Account to the extent of the credit limit set by the creditor. Each applicant may be liable for the amount extended under this Account to any joint applicant. As required by law, you're hereby notified that we may submit a negative credit report to a credit-reporting agency if you fail to fulfill the terms of your credit obligations, which may reflect on your credit profile.

**Delaware:** Any service charges not in excess of those permitted by law will be charged on the outstanding balances from month to month.

**Ohio:** The Ohio laws against discrimination require that all creditors make credit equally available to all creditworthy customers, and that credit-reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

**Wisconsin:** Your signature confirms that this loan obligation is being incurred in the interest of your marriage or family. No provision of any marital property agreement, unilateral statement, or court decree adversely affects a creditor's interest unless, prior to the time the credit is granted, the creditor furnishes a copy of the agreement, statement, or decree, or has actual knowledge of the adverse provision. Married residents of Wisconsin applying for an individual account must give us the name and address of their spouse if the spouse is also a Wisconsin resident. Please provide this information to us at Mission Lane LLC, P.O. Box 105286, Atlanta, GA 30348.

# 12. Your Billing Rights

By: Transportation Alliance Bank, Inc. dba TAB Bank

**This notice tells you about your rights and our responsibilities under the Fair Credit Billing Act. Keep this document for future use.**

### What To Do If You Find a Mistake on Your Statement

If you think there's an error on your statement, write to us at: Mission Lane LLC, P.O. Box 105286, Atlanta, GA 30348 with Attn: Billing Dispute.

**In your letter, please provide us with the following information:**

- *Account information:* Your name and account number.
- *Dollar amount:* The dollar amount of the suspected error.
- *Description of problem:* If you think there's an error on your bill, describe what you believe is wrong and why you believe it's a mistake.

**You must contact us:**

- Within 60 days after the error first appeared on your statement.

You must notify us of any potential errors *in writing*. You may call us, but if you do we're not required to investigate any potential errors and you may have to pay the amount in question.

### What Will Happen After We Receive Your Letter

**When we receive your letter, we must do two things:**

1. Let you know we've received your letter within 30 days of receiving it. We'll also tell you if we've already corrected the error.
2. Either correct the error or explain to you why we believe the bill is correct within 90 days of receiving your letter.

**While we investigate whether there's been an error:**

- We can't try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount.
- While you don't have to pay the amount in question, you're still responsible for your remaining balance.
- We can subtract any unpaid amount from your credit limit.

**After we finish our investigation, one of two things will happen:**

- *If we made a mistake*: You will not have to pay the amount in question or any interest or other fees related to that amount.
- *If we do not believe we've made a mistake*: You will have to pay the amount in question, along with applicable interest and fees. We will send you a statement of the amount you owe and the date payment is due. We may then report you as delinquent if you do not pay the amount we think you owe.

If you receive our explanation but still believe your bill is wrong, you must write to us within *10 days* telling us that you still refuse to pay. If you do so, we can't report your Account as delinquent without also reporting that you're questioning your bill. We must tell you the name of anyone we've reported you as delinquent to, and we must let those organizations know when the matter has been resolved between you and us.

If we don't follow all of the rules above, you don't have to pay the first $50 of the amount in question (even if your bill is correct).

**These are your rights if you're unsatisfied with your purchases:**

If you're not happy with the goods or services you've purchased with your credit card, and you've tried in good faith to correct the problem with the merchant, then you may have the right not to pay the remaining amount that's due on the purchase.

**To use this right, all of the following must be true:**

1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50.
   **Note:** neither of these are necessary if your purchase was based on an advertisement we made to you, or if we own the company that sold you the goods or services.
2. You've used your credit card for the purchase. Purchases made with cash advances from an ATM don't qualify.
3. You haven't fully paid for the purchase yet.

If you've met all of the above criteria and you're still dissatisfied with the purchase, contact us in writing at Mission Lane LLC, Customer Service, P.O. Box 105286, Atlanta, GA 30348.

While we look into this for you, the same rules apply to the disputed amount as mentioned within the *While we investigate whether there's been an error* section above. After we finish our investigation, we'll tell you our answer. Then, if we think you owe an amount and you still don't pay it, we may report your Account as delinquent.

(Exhibit B)

# NOTICE OF CLAIM TO INTEREST

## 1st ATTEMPT

45D10 2 4 0 6 CC 0 6 2 9 0

**Filed in Clerk's Office**

JUN 21 2024

Michael A. Brown
CLERK LAKE CIRCUIT COURT

Synovus Remittance

C/O Remittance Processing

Attn: Mission Lane

1137 1st Avenue

Columbus, GA 31901

RE: Tender of Payment

I Talley Smith, Jordan-C/Agent on behalf of JORDAN TALLEY SMITH/Principal hereby accept All Titles, All Rights, All Interest, and Guaranteed Equity owed to Principal JORDAN TALLEY SMITH. Therefore, I instruct the CFO of Mission Lane LLC (Henry Domenici) to apply Principals Balance to Principals Account number ending in 3753 each and every billing cycle in Accord and Satisfaction to the contract for set-off. Please apply this tender of payment to the account within 5 business days after receipt of this notice. I also instruct CFO (Henry Domenici) to communicate through writing if there are any discrepancies within the 5 business days. If no communication is made within the 5 business days after receipt of this notice, then I can assume that the said instructions have been completed. THESE INSTRUCTIONS ARE NON-NEGOTIABLE!!!

Sign: *Jordan Talley-Smith*

Date: 4/13/24

# Opportunity to Cure

## 2nd ATTEMPT

Synovus Remittance

C/O Remittance Processing

Attn: Mission Lane

1137 1st Avenue

Columbus, GA 31901


RE: Tender of Payment


I Talley Smith, Jordan-C/Agent on behalf of JORDAN TALLEY SMITH/Principal hereby accept All Titles, All Rights, All Interest, and Guaranteed Equity owed to Principal JORDAN TALLEY SMITH. Therefore, I instruct the CFO of Mission Lane LLC (Henry Domenici) to apply Principals Balance to Principals Account number ending in 3753 each and every billing cycle in Accord and Satisfaction to the contract for set-off. Please apply this tender of payment to the account within 5 business days after receipt of this notice. I also instruct CFO (Henry Domenici) to communicate through writing if there are any discrepancies within the 5 business days. If no communication is made within the 5 business days after receipt of this notice, then I can assume that the said instructions have been completed. THESE INSTRUCTIONS ARE NON-NEGOTIABLE!!!


Sign: *Jordan Talley - Smith*

Date: 5/3/24

# NOTICE OF CLAIM TO INTEREST

JORDAN TALLEY-SMITH
4436 Torrence Ave
Hammond, IN. 46327
Email: talleysmithj@yahoo.com
Phone Number: 708-639-0828
Date: 5/17/24

## 3rd Attempt
## DEFAULT JUDGEMENT

Henry Domenici
Chief Financial Officer
Mission Lane LLC
Synovus Remittance
C/O Remittance Processing
Attn: Mission Lane
1137 1st Avenue
Columbus, GA. 31901

     I Talley Smith, Jordan-C (Agent) on behalf of JORDAN TALLEY SMITH (Principal) hereby accept All Titles, All Rights, All Interest, and Guaranteed Equity owed to Principal JORDAN TALLEY SMITH. Therefore, I instruct the CFO of Mission Lane LLC (Henry Domenici) to apply Principals Balance to Principals Account number ending in 3753 each and every billing cycle in Accord and Satisfaction to the contract for set-off. Please apply this TENDER OF PAYMENT to the account within 5 business days after receipt of this notice. I also instruct CFO (Henry Domenici) to communicate through writing if there are any discrepancies within the 5 business days. If no communication is made within the 5 business days after receipt of this notice, then I can assume that the said instructions have been completed. THESE INSTRUCTIONS ARE NON-NEGOTIABLE!!!

Sign: *Jordan Talley-Smith*

**Filed in Clerk's Office**

45D10  2 4 0 6 CC 0 6 2 9 0

Mission Lane 1st Claim to Interest 1st Attempt
Tracking Number:
9589071052701169761884
Copy Add to Informed Delivery

JUN 21 2024

*Michael A. Brown*
CLERK LAKE CIRCUIT COURT

Latest Update

Your item has been delivered and is available at a PO Box at 7:05 am on April 25, 2024 in
COLUMBUS, GA 31901.

---

**Get More Out of USPS Tracking:**
USPS Tracking Plus®

Delivered
Delivered, PO Box
COLUMBUS, GA 31901
April 25, 2024, 7:05 am
Available for Pickup
DOWNTOWN COLUMBUS
120 12TH ST LBBY
COLUMBUS GA 31901-9998
M-F 0700-1700
April 24, 2024, 3:49 pm
Arrived at Post Office
COLUMBUS, GA 31901
April 24, 2024, 3:42 pm
Forwarded
COLUMBUS, GA
April 23, 2024, 8:30 am
Arrived at USPS Regional Destination Facility
MACON GA DISTRIBUTION CENTER ANNEX
April 21, 2024, 3:21 pm
In Transit to Next Facility
April 20, 2024
Arrived at USPS Regional Origin Facility
CAROL STREAM IL DISTRIBUTION CENTER
April 18, 2024, 12:08 am
Departed Post Office
MUNSTER, IN 46321
April 15, 2024, 6:26 pm
USPS in possession of item
MUNSTER, IN 46321
April 15, 2024, 5:54 pm

Mission Lane Claim to Interest 2nd Attempt
Tracking Number:
70202450000178552491
Copy Add to Informed Delivery
Latest Update
Your item has been delivered and is available at a PO Box at 7:16 am on May 9, 2024 in
COLUMBUS, GA 31901.

---

**Get More Out of USPS Tracking:**
USPS Tracking Plus©
Delivered
Delivered, PO Box
COLUMBUS, GA 31901
May 9, 2024, 7:16 am
Available for Pickup
DOWNTOWN COLUMBUS
120 12TH ST LBBY
COLUMBUS GA 31901-9998
M-F 0700-1700
May 8, 2024, 10:17 am
Forwarded
COLUMBUS, GA
May 7, 2024, 10:13 am
Available for Pickup
COLUMBUS, GA 31901
May 7, 2024, 6:26 am
Arrived at Post Office
COLUMBUS, GA 31907
May 7, 2024, 6:15 am
Departed USPS Facility
PALMETTO, GA 30268
May 6, 2024, 11:30 am
Arrived at USPS Regional Facility
ATLANTA GA DISTRIBUTION CENTER
May 6, 2024, 4:12 am
Arrived at USPS Facility
PALMETTO, GA 30268
May 5, 2024, 9:18 pm
Departed USPS Regional Facility
CHICAGO IL NETWORK DISTRIBUTION CENTER
May 5, 2024, 5:15 am
Arrived at USPS Regional Origin Facility
CHICAGO IL NETWORK DISTRIBUTION CENTER
May 5, 2024, 3:00 am
In Transit to Next Facility
May 4, 2024

Departed Post Office
HAMMOND, IN 46320
May 3, 2024, 6:17 pm
USPS in possession of item
HAMMOND, IN 46320
May 3, 2024, 4:54 pm

Mission Lane Claim to Interest 3rd Attempt
Tracking Number:
70221670000193084376
Copy Add to Informed Delivery

Latest Update

Your item has been delivered and is available at a PO Box at 7:09 am on May 28, 2024 in COLUMBUS, GA 31901.

---

**Get More Out of USPS Tracking:**
USPS Tracking Plus®

Delivered

Delivered, PO Box
COLUMBUS, GA 31901
May 28, 2024, 7:09 am
In Transit to Next Facility
May 27, 2024
Arrived at USPS Regional Destination Facility
MACON GA DISTRIBUTION CENTER ANNEX
May 23, 2024, 12:35 pm
Arrived at USPS Regional Origin Facility
BEDFORD PARK IL DISTRIBUTION CENTER
May 17, 2024, 11:31 pm
USPS in possession of item
HAMMOND, IN 46320
May 17, 2024, 4:27 pm

Mission Lane Notice of Assessment
Tracking Number:
9589071052701253479114
Copy Add to Informed Delivery

## Latest Update

Your item was delivered to an individual at the address at 9:16 am on June 6, 2024 in OGDEN, UT 84403.

---

**Get More Out of USPS Tracking:**
USPS Tracking Plus®

## Delivered

Delivered, Left with Individual
OGDEN, UT 84403
June 6, 2024, 9:16 am
Arrived at USPS Regional Destination Facility
SALT LAKE CITY DISTRIBUTION CENTER
June 5, 2024, 1:50 pm
In Transit to Next Facility
June 4, 2024
Departed Post Office
EAST CHICAGO, IN 46312
June 3, 2024, 5:43 pm
USPS in possession of item
EAST CHICAGO, IN 46312
June 3, 2024, 3:10 pm

Mission Lane Amended Agreement
Tracking Number:
9589071052701253479121
Copy Add to Informed Delivery
## Latest Update
Your item has been delivered and is available at a PO Box at 1:43 pm on June 9, 2024 in ATLANTA,
GA 30348.

---

**Get More Out of USPS Tracking:**
**USPS Tracking Plus®**
## Delivered
Delivered, PO Box
ATLANTA, GA 30348
June 9, 2024, 1:43 pm
Available for Pickup
ATLANTA
3900 CROWN RD SW
ATLANTA GA 30304-9998
M-SAT 0800-2200; SUN 0900-2000
June 9, 2024, 2:16 am
Arrived at Hub
ATLANTA, GA 30304
June 9, 2024, 12:09 am
Arrived at USPS Regional Destination Facility
ATLANTA-PEACHTREE GA DISTRIBUTION CENTER
June 6, 2024, 6:58 am
In Transit to Next Facility
June 5, 2024
Departed Post Office
EAST CHICAGO, IN 46312
June 3, 2024, 5:43 pm
USPS in possession of item
EAST CHICAGO, IN 46312
June 3, 2024, 3:11 pm

The following chart depicts dates and amounts previously paid to the Account by the Plaintiff.

## Past Payment History

| Date | Amount |
|------|--------|
| 6/20/2023 | $25 |
| 7/26/2023 | $293.20 |
| 8/15/2023 | $53 |
| 8/26/2023 | $112.41 |
| 8/30/2023 | $40 |
| 9/04/2023 | $200 |
| 9/19/2023 | $100 |
| 10/27/2023 | $40 |
| 11/03/2023 | $50 |
| Total | $913.61 |

Filed in Clerk's Office

JUN 21 2024

Michael A. Brown
CLERK LAKE CIRCUIT COURT

*Note: 2 years of payment history is missing and was not accessible. Dates in-between Account opening and 6/20/2023.

The next chart depicts reasonable attorney's fees demanded from the Defendant and requested from the Courts.

## Lawyer Fee Schedule

| Daily Rate | Number or days | Total Amount |
|------------|----------------|--------------|
| $5,000 | 27 | $135,000 |

The last chart depicts total Court costs.

## Total Court Costs

| | |
|------|------|
| Overdue Balance | $807.32 |
| Past Payments | $913.61 |
| Attorney Fee | $135,000 |
| Total | $136,720.93 |

Signature: *Jorda Talley-Smith*

Account Number #### #### #### 3753

JORDAN TALLEY-SMITH
4436 Torrence Ave
Hammond, IN. 46327
Email: talleysmithj@yahoo.com
Phone Number: 708-639-0828
Date: 6/3/24

Mission Lane LLC
P.O. Box 105286
Atlanta, GA.
30348-5286

**Filed in Clerk's Office**

JUN 21 2024

Michael A. Brown
CLERK LAKE CIRCUIT COURT

RE: AMENDED AGREEMENT

   To whom it may concern, I am writing this letter as a formal notice to inform you that your company, Mission Lane LLC, is in breach of its fiduciary duty and to **REDRESS** the terms and conditions of the contract pursuant to Federal law that has not been or will not be beneficial to my principal. Lastly, I request a prompt refund of all unearned interest collected on behalf of my consumer pursuant to 15 USC 1615.

   First, I would like to state a few laws that govern all Consumer Credit Transactions under the Truth and Lending Act that are enforceable under this contract.
**Governing Laws:**
- **15 USC 1601-**Congressional findings:
  - Congress finds that the informed use of credit results from an awareness of the cost thereof by **Consumers**.
  - Congress discloses the meaning of credit terms so that the **Consumer** is able to compare more readily the various credit terms available to him and **avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.**
  - Congress also finds that there has been a recent **TREND** toward leasing automobiles and other durable goods for **CONSUMER** use as an alternative to installment credit sales and that these leases have been offered without adequate cost disclosures.
  - Congress assures a meaningful disclosure of the terms of leases of personal property for **PERSONAL, FAMILY, or HOUSEHOLD** purposes so as to enable the **lessee** to compare more readily the various lease terms available to him, limit balloon payments in consumer leasing, enable comparison of lease terms with credit terms where appropriate, and to assure meaningful and accurate disclosures of lease terms in advertisements.

- **15 USC 1602-**Definitions and rules of construction:
  - The term "organization" means a corporation, government or governmental subdivision or agency, **TRUST**, **ESTATE**, partnership, cooperative, or association.

- The term "person" means a **NATURAL PERSON** or an organization.
- The term "credit" means the **RIGHT GRANTED** by a **CREDITOR** to a debtor to defer payment of debt or to incur debt and defer its payment.
- The term "creditor" refers **ONLY** to a **PERSON** who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a **finance charge** is or may be required, and (2) is the **PERSON** to whom the debt arising from the **CONSUMER CREDIT TRANSACTION** is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by **AGREEMENT**. Notwithstanding the preceding sentence, in the case of an **OPEN-END CREDIT PLAN** involving a **CREDIT CARD**, the card issuer and any **PERSON** who honors the **CREDIT CARD** and offers a discount which is a **finance charge** are **CREDITORS**.
- The term "credit sale" refers to any sale in which the **seller** is a **CREDITOR**. The term includes **any contract** in the form of a bailment or **lease** if the bailee or **lessee** contracts to pay as compensation for use a sum substantially equivalent to or in excess of the aggregate value of the property and services involved and it is **agreed** that the bailee or **lessee** will become, or for no other or a nominal **consideration** has the option to become, the **owner** of the property upon full compliance with his obligations under the contract.
- The adjective "consumer", used with reference to a **CREDIT TRANSACTION**, characterizes the transaction as one in which the party to whom **CREDIT** is offered or extended is a **NATURAL PERSON**, and the money, property, or services which are the subject of the transaction are primarily for **PERSONAL, FAMILY, or HOUSEHOLD** purposes.
- The terms "open end credit plan" and "open end consumer credit plan" mean a plan under which the **CREDITOR** reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a **finance charge** which may be computed from time to time on the outstanding unpaid balance. A **CREDIT PLAN** or **OPEN END CONSUMER CREDIT PLAN** which is an **OPEN END CREDIT PLAN** or **OPEN END CONSUMER CREDIT PLAN** within the meaning of the preceding sentence is an **OPEN END CREDIT PLAN** or **OPEN END CONSUMER CREDIT PLAN** even if credit information is verified from time to time.
- The term "credit card" means **any card, plate, coupon book** or other **CREDIT** device existing for the purpose of obtaining money, property, labor, or services on **CREDIT**.
- The term "accepted credit card" means **any CREDIT CARD** which the cardholder has requested and received or has signed or has used, or authorized another to use, for the purpose of obtaining money, property, labor, or services on **CREDIT**.

- **15 USC 1605-**Determination of finance charge
  (a) "FINANCE CHARGE" Defined

- Except as otherwise provided in this section, the amount of the **FINANCE CHARGE** in connection with <u>any</u> **CONSUMER CREDIT TRANSACTION** shall be determined as the **<u>sum of all charges</u>**, payable directly or indirectly by the **PERSON** to whom the **CREDIT** is extended, and imposed directly or indirectly by the **CREDITOR** as an incident to the extension of **CREDIT**. The **FINANCE CHARGE <u>does not</u>** include charges of a type payable in a comparable <u>CASH</u> transaction. The **FINANCE CHARGE <u>shall not</u>** include fees and amounts imposed by third party closing agents (including settlement agents, attorneys, and escrow and title companies) if the **CREDITOR** does not require the imposition of the charges or the services provided and does not retain the charges. Examples of charges which are included in the **FINANCE CHARGE** include any of the following types of charges <u>which are applicable</u>:
  (1) **Interest**, time price differential, and any amount payable under a point, discount, or other system or additional charges.
  (2) Service or carrying charge.
  (3) Loan fee, finder's fee, or similar charge.
  (4) Fee for an investigation or credit report.
  (5) Premium or other charge for any guarantee or insurance protecting the **CREDITOR** against the **<u>obligor's</u>** default or other **CREDIT** loss.
  (6) Borrower-paid mortgage broker fees, including fees paid directly to the broker or the lender (for delivery to the broker) whether such fees are paid in cash or **FINANCED**.

(b) Life, accident, or health insurance premiums included in **FINANCE CHARGE**

- Charges or premiums for **CREDIT** life, accident, or health insurance written in connection with **<u>any</u> CONSUMER CREDIT TRANSACTION** shall be included in the **FINANCE CHARGES** unless

(1) the coverage of the debtor by the insurance is not a factor in the approval by the **CREDITOR** of the extension of **CREDIT**, and this fact is clearly disclosed in writing to the **PERSON** applying for or obtaining the extension of **CREDIT**; and

(2) in order to obtain the insurance in connection with the extension of **CREDIT**, the **PERSON** to whom the **CREDIT** is extended must give specific affirmative written indication of his desire to do so after written disclosure to him of the cost thereof.

**(c)** Property damage and liability insurance premiums included in **FINANCE CHARGE**

- Charges or premiums for insurance, written in connection with **<u>any</u> CONSUMER CREDIT TRANSACTION**, against loss of or damage to property or against liability arising out of the <u>ownership</u> or use of property, <u>shall</u> be included in the **FINANCE CHARGE** unless a clear and specific statement in writing is furnished by the **CREDITOR** to the **PERSON** to whom the **CREDIT** is extended, setting forth the cost of the insurance if obtained from or through the **CREDITOR**, and stating that the **PERSON** to whom the **CREDIT** is extended may choose the **PERSON** through which the insurance is to be obtained.

- **12 USC 1431-**Powers and duties of Banks
(a) **Borrowing money**; issuing bonds and debentures; general powers
  - (a) Each Federal Home Loan Bank **shall** have power, subject to rules and regulations prescribed by the Director, to **borrow** and give security therefor and to **pay interest** thereon, to issue debentures, bonds, or other obligations upon such terms and conditions as the Director may approve, and to do all things necessary for carrying out the provisions of this chapter and all things incident thereto.

- **15 USC 1615-**Prohibition on use of "Rule of 78's" in connection with mortgage refinancings and other **CONSUMER** loans
(a) Prompt refund of **unearned interest** required
  - (1) In general
    If a **CONSUMER prepays** in full the **FINANCED** amount under **any CONSUMER CREDIT TRANSACTION**, the **CREDITOR shall** promptly refund any **unearned** portion of the **interest** charge to the **CONSUMER**.
    (2) Exception for refund of de minimus [1] amount
    No refund shall be required under paragraph (1) with respect to the prepayment of any **CONSUMER CREDIT TRANSACTION** if the total amount of the refund would be less than **$1**.
    (3) Applicability to refinanced transactions and acceleration by the **creditor**
    This subsection **shall** apply with respect to any prepayment of a **CONSUMER CREDIT TRANSACTION** described in paragraph (1) without regard to the manner or the reason for the prepayment, including—
    (a) **any** prepayment made in connection with the refinancing, consolidation, or restructuring of the transaction; and
    (b) **any** prepayment made as a result of the acceleration of the obligation to repay the amount due with respect to the transaction.

**Other laws governing the exchange of securities:**
- **Truth In Lending Act**
- **Security Exchange Act**
- **Bill of Exchange Act**
- **Trust Indenture Act**
- **Federal Reserve Act**
- **Federal Arbitration Act**

Now, with respect to the above governing laws, I would like to address the current terms and conditions of the Contract.

**Current terms**:
1) We may decline a transaction at our sole discretion, even if the transaction wouldn't cause your Account to go over your credit limit or your Account isn't in default. We will not be liable to you if we decline a transaction, or if anyone refuses to accept your Card for any reason. We're also not responsible for any losses that you may incur if/when our services are unavailable due to factors beyond our control.

2) Credit Limit:
   We assign a credit limit to your Account, which is the dollar amount of credit available to borrow on your Account. We may allow you to use a portion of the credit limit for Cash Advances. We tell you these credit limits at Account opening and as stated on your credit card mailer. We may refer to your credit limits as "credit lines." There may be a limit on the amount of Cash Advances you can take in a given time period. We may increase or decrease your Account credit limit or your Cash Advance credit limit without notice.

3) You must manage your Account to stay below your credit limits. If you do not, we may request immediate payment of the amount by which you exceed your credit limit. At our discretion, we may authorize transactions that could cause your balance to exceed your credit limit. If we do, these transactions won't increase your credit limit. You're responsible for paying these transactions. We may also increase, decrease, restrict, or cancel your credit limit for any particular Balance at any time at our discretion. These actions don't impact your obligation to repay your Account.

4) Promise to Pay:
   You promise to pay us for all amounts charged to the Account or due under this Agreement, including all transactions, interest or fees, and other charges. You're obligated to repay us for all transactions made by you and/or by other people you have allowed to use the Card, even if their use of the Card exceeds the authorization you gave them, the Card is not present, the transaction wasn't signed for, or the transaction was made using a mobile wallet.

5) You authorize us to obtain and use credit, income, employment, or other information about you from consumer-reporting agencies and others, for any legitimate purpose, including extending credit, servicing, the ongoing review or collection of your Account, or to consider you for other products and services, as permitted by law. We may report information about you and your Account to credit reporting agencies. We normally report to credit reporting agencies each month. Late payments, missed payments, or other defaults on the Account may be shown in your credit report.

6) Customer Privacy and Information Sharing: When you applied for an Account, you gave permission for your personal information to be shared, including for purposes other than the servicing of the Account, such as offering you special benefits or other products and services by us or others. More information about how information about you is shared is set forth in the Privacy Notices for your Account.

7) Contact Information: You agree to promptly notify us when your contact information changes. We may ask you for additional information and/or documentation to verify any information you provide to us. We may restrict or close your Account if we can't verify your information, or if you can't provide certain information that we may request.

8) Communications: You agree that we (including any companies working on our behalf to service your Account) may contact you, including calls, text message(s), or email, at any

phone number, email address, text number or mailing address you provide to us, from which you contacted us, or we receive and believe we can reach you at, to the extent permitted by applicable law, including for purposes of collections. When you give us your phone number, you agree that we (including any companies working on our behalf to service your Account) have your explicit permission and consent authorizing us to contact you at that number, subject to your privacy preferences. Your consent allows us (including any companies working on our behalf to service your Account) to use text messaging, automatic phone dialing systems, artificial or prerecorded voice message systems, and automated texting and email technology, even if you are charged message and data rates for the calls and texts. Automated messages may be played when the telephone is answered, whether by you or someone else. You may contact us at any time to review your preferences or advise that you no longer wish to be contacted on your cell phone, email, or by text. You are responsible for the actions taken on your Account by anyone to whom you have provided shared access to your Account. Where allowed by law, we (including any companies working on our behalf to service your Account) also may contact other individuals who may be able to provide updated employment, location, and/or contact information for you. You agree that we may listen to and record your phone calls with us, and may use your voice recordings for verification purposes. Note: The express consent in this provision includes and extends to any affiliates, agents, contractors, representatives, servicers, service providers, or subsequent owner of your Account.

9) Default: We may require immediate payment of your total Account balance, to the extent allowed by law, if any of the following occur:

> (b) You fail to comply with the terms of this Agreement or other agreements relating to your Account, including failing to make a required minimum payment when due, exceeding your Account credit limit or using your Card or Account for an illegal transaction;
>
> (c) You make a payment that's not honored for any reason;
>
> (d) You file for bankruptcy or some other insolvency proceeding is filed by or against you;
>
> (e) We reasonably believe you may be unable or unwilling to pay your debts as agreed, including if you're declared incompetent, incapacitated, or deceased;
>
> (f) You breach any term under this Agreement
>
> (g) We determine that any statement made by you to us, including through any service provider, in connection with this Agreement or your Account was false, misleading, or attempted fraud; or
>
> (h) You no longer live permanently in the U.S.

In accordance with applicable law, if your Account is in default, we may:

a) Close or suspend your Account without notice (unless as applicable law requires otherwise);

b) Require you to pay your unpaid balance immediately;

c) Continue to charge you interest and fees (as previously disclosed) as long as your Account has a balance; and/or

d) Attempt to collect or pursue other actions permitted by law.

10) Collection Proceedings: If we use an attorney to collect your Account, we may charge you our legal costs as permitted by law. These include reasonable attorneys' fees, court or other collection costs, and fees and costs of any appeal.

11) Closing Your Account: You may close your Account at any time by contacting us at 855-790-8860 or support@missionlane.com. We may close or suspend your Account at our discretion at any time. If the Account is closed, you must stop using it and destroy the Card(s). You must still pay us all amounts you owe—even for transactions that post to your Account after it's been closed or suspended - and the Agreement remains in effect until you pay the outstanding balance. We may cancel your current Card and issue you a substitute Card at any time.

12) If you ask us to close your Account but there is continued use of your Account after the date of cancellation (such as automatic payments or subscriptions), we'll consider the continued use as your request for reinstatement of your Account. We may then reinstate your Account under the same terms.

13) Governing Law: The terms and enforcement of this Agreement are governed by federal law, and to the extent not preempted by federal law, the laws of Utah, regardless of any conflict of laws principles. The Federal Arbitration Act will govern any arbitration related to this Account and not any state law.

14) Waiver: We may delay enforcing or not enforce any of our rights under this Agreement without losing or waiving any of them.

15) Assignment: We may assign, transfer, or sell your Account or any portion of it without notifying you. You may not assign, transfer, or sell your Account without first obtaining our written consent.

16) Change of Terms: We may change, add, or remove provisions of this Agreement for any reason and at any time, subject to applicable law. These changes may apply to existing and future balances on your Account, to the extent permitted under applicable law. We'll give you notice of any change. A change with advance written notice may include a right to reject the change(s), including if required by law. We may require you to close your Account or take other actions if you reject the changes.

17) Severability: Subject to the Arbitration Agreement: (1) if any part of this Agreement conflicts with applicable law, then that law will control, and this Agreement will be considered changed to comply with that law; and (2) if any part of this Agreement found to be invalid, the remainder of this Agreement will remain in effect.

18) Events Outside of Our Control: Sometimes our services may be unavailable due to factors beyond our control, and you may not always be able to use your Card or get information about your Account. We're not liable when this happens.

19) Merchant Disputes: If you have a dispute with a merchant, you may request a credit to your Account. If we resolve the dispute in your favor, we will issue a credit to your Account. You assign to us your claim for the credited amount against the merchant and/or any third party. At our request, you agree to provide this assignment in writing.

20) Automatic Account Information Updates: You may set up automatic billing or store your Account information with a merchant, wallet provider, or other third party ("Permitted Party"). If you do, you authorize us to share your Account information, with the Permitted Party, regarding the use of your Account. If your Account information changes, which may include your billing address, you authorize us to provide this updated information to any such Permitted Party at our discretion. You must contact the Permitted Party directly or remove your credit card information from the Permitted Party website if you wish to stop automatic billing or Account updates.

Next, I would like to set right the terms and conditions of this contract with respect to the governing laws mentioned in section 1 of this notice.

**Amended terms:**

1) You may only decline a transaction at my sole discretion, even if the transaction would cause my account to go over my credit limit or my account is in default. You will be liable to me if you decline a transaction or if anyone refuses to accept my Card for any reason. You're also responsible for any losses that I may incur if/when your services are unavailable due to factors beyond my control.

2) Credit Limit:
   I gave you security interest in the form of a promissory note as a loan. In return for the loan, you agree to give me a line of credit and pay me a fixed return over a set period of time. I allow you to utilize the security I provided to finance any aspect of your business, from launching new products to repaying more expensive debt as required by applicable law. Credit limits will be established at Account opening and stated on my credit card mailer. I shall refer to my credit limits as "lines of credit" or "credit lines". There shall be no limit on the amount of Cash Advances I can take in a given time period. I may request an increase to my Account credit limit or Cash Advance credit limit by formal written notification to Mission Lane LLC.

3) I will manage my Account to stay below my credit limit. In the event that I exceed my credit limit, you will immediately pay the exceeded amount as well as any balance or interest owed on my account. Only at my discretion can any transaction be authorized that could cause my balance to exceed my credit limit. If I do, these transactions will increase my credit limit. You are responsible for applying the principal's Balance to the principal's Account each and every billing cycle or for the duration of the contract. You may not decrease, restrict, or cancel my credit limit for any particular Balance at any time. I am not obligated to repay any amount under this contract. Any amount due or

interest accrued under or relating to this Contract is added to the finance charge and paid to my principal.

4) Promise to Pay:
I revoke my promise to pay you for any amounts charged to my Account or due under this Agreement, including all transactions, interests or fees, and other charges. I authorize you to use the security interest I provided at contract signing to pay any and all obligations owed under this Agreement. I am not obligated to repay you for any transactions made by me and/or by other people I have allowed to use my Card, even if their use of the Card exceeds the authorization I gave them, the Card is not present, the transaction wasn't signed for, or the transaction was made using a mobile wallet.

5) I revoke your authorization to obtain and use credit, income, employment, or other information about me from consumer-reporting agencies and others, for any legitimate purpose, including extending credit, servicing, the ongoing review or collection of my Account, or to consider me for other products and services, as permitted by law. You may not report any information about me and my Account to credit reporting agencies or show any late payments, missed payments, or other defaults on my credit report without my authority.

6) Customer Privacy and Information Sharing: I revoke the permission that I gave you to share my information, including for purposes other than the servicing of the Account, such as offering me special benefits or other products and services by you or others. Therefore, I require that this information be in place of the old information set forth in the Privacy Notices for my Account.

7) Contact Information: I agree to notify you at my leisure when my contact information changes. You may not ask me for any additional information and/or documentation to verify any information I provide to you. No additional information and/or documentation is required. You may not restrict or close my Account just because you can't verify my information, or if I decline to provide certain information that you may request.

8) Communications: I do not agree to you (including any companies working on your behalf to service my Account) contacting me, including calls, text message(s), or email, at any phone number, email address, text number or mailing address I provide to you, from which I contacted you, or you receive and believe you can reach me at, to the extent permitted by applicable law, especially for purposes of collections. Even though I gave you my phone number, you (including any companies working on your behalf to service my Account) DO NOT have my explicit permission and consent authorizing you to contact me at that number. These are my privacy preferences. You DO NOT have my consent. I DO NOT authorize you (including any companies working on your behalf to service my Account) to use text messaging, automatic phone dialing systems, artificial or prerecorded voice message systems, and automated texting and email technology, especially if I am charged message and data rates for the calls and texts. Not even Automated messages may be played when the telephone is answered whether by me or

someone else. I may contact you at any time to review my preferences or advise that I no longer wish to be contacted on my cell phone, email, or by text. I am responsible for the actions taken on my Account by anyone to whom I have provided shared access to my Account. By law, you (including any companies working on your behalf to service my Account) are NOT authorized to contact any other individuals or third parties to obtain updated employment, location, and/or contact information on/for me. You agree that I may listen to and record our phone calls. I DO NOT agree for you to use my voice recordings for verification purposes. Note: The express nonconsent in this provision includes and extends to any affiliates, agents, contractors, representatives, servicers, service providers, or subsequent owner of my Account.

9) Default: In the event that my Account goes into default, the bill may be deemed a bill payable on demand and the whole shall become due even if dishonored by non-acceptance or previous refusal to accept pursuant to the Bill of Exchange Act:
Part 2 Sec. 9 Sum payable.
(1) The sum payable by a bill is a sum certain within the meaning of this Act, although it was required to be paid—
(a) With **INTEREST.**
(b) By stated instalments.
(c) By stated instalments, with a provision that upon default in payment of any instalment **the whole shall become due**.
Sec. 10 Bill payable on demand.
(1) A bill is payable on demand—
(a) Which is **expressed** to be **payable on demand**, or at sight, or on presentation; or
(b) In which no time for payment is expressed.
(2) Where a bill is **accepted or indorsed** when it is overdue, it shall, as regards the acceptor who so accepts, or any indorser who so indorses it, **be deemed a bill payable on demand.**
Sec. 18 Time for acceptance.
A bill may be accepted—
(1) Before it has been signed by the drawer, or while otherwise incomplete:
(2) When it is overdue, or after it has been dishonoured by a previous refusal to accept, or by non-payment:
(3) When a bill payable after sight is dishonoured by non-acceptance, and the drawee subsequently accepts it, the holder, in the absence of any different agreement, is **entitled to have the bill accepted** as of the date of first presentment to the drawee for acceptance.

In accordance with applicable law, any obligation you neglect to perform on behalf of my Account will:
a) Be deemed breach of contract or fiduciary duty;
b) Require you to pay the unpaid balance immediately;
c) Continue to accrue interest and fees owed to my principal (as previously disclosed) as long as my Account is open; and/or
d) If my Account is closed or suspended, may remain enforceable against all parties liable on the bill until the sum of the balance is paid to my principal.

10) Collection Proceedings: In the event I have to take action on my account as holder in due course, I may charge you my legal costs as permitted by law. These include reasonably attorney's fees, court or collection costs, and fees and costs of any appeal.

11) Closing My Account: At my discretion I may close my Account at any time by contacting Mission Lane LLC in writing at the correspondence address indicated on the billing statement. If my account is closed or suspended, all equity, interest, and/or unearned interest accrued on my Account is immediately paid to my principal or anyone acting on behalf of my principal. If I close my Account, you are no longer authorized to trade my securities and/or be accredited on behalf of my account. you must still pay any and all equity and interest you owe—even from transactions that post to my Account after it's been closed or suspended - and the Agreement remains in effect until you pay the outstanding balance to my principal. You may cancel my current Card and issue me a substitute Card upon my request.

12) If I ask you to close my Account but you continue to use my Account after the date of cancellation (such as exchanging securities and paying debts), you must still pay any and all equity and interest you owe to my principal under these same terms.

13) Governing Law: The terms and enforcement of this Agreement are governed by federal law, and to the extent not preempted by federal law, the laws of Utah, regardless of any conflict of laws principles. The Federal Arbitration Act will govern any arbitration related to this Account and not any state law.

14) Waiver: If you delay enforcing or don't enforce any of your rights under this Agreement you lose and waive all of them.

15) Assignment: You may NOT assign, transfer, or sell my Account or any portion of it without first obtaining my written consent. I may assign, transfer, or sell my Account without notifying you.

16) Change of Terms: I may change, add, or remove provisions of this Agreement for any reason and at any time, subject to applicable law. These changes may apply to existing and future balances on my Account, to the extent permitted under applicable law. I'll give you notice of any change. A change with advance written notice may include a right to reject the change(s), including if required by law. I may take legal action and enforce payment against all parties liable on the bill as holder in due course if you reject the changes.

17) Severability: Subject to the Arbitration Agreement: (1) if any part of this Agreement conflicts with applicable law, then that law will control, and this Agreement will be considered changed to comply with that law; and (2) if any part of this Agreement found to be invalid, the remainder of this Agreement will remain in effect.

18) Events Outside of Your Control: Sometimes your services are unavailable due to factors beyond your control, and I may not be able to use my Card or get information about my Account. If this happens, you ARE liable.

19) Merchant Disputes: If I have a dispute with a merchant, I may request a credit to my Account. If you resolve the dispute in my favor, you will issue a credit to my Account. I assign to you my claim for the credited amount against the merchant and/or any third party. At your request, I agree to provide this assignment in writing.

20) Automatic Account Information Updates: I may set up automatic billing or store my Account information with a merchant, wallet provider, or other third party ("Permitted Party"). If I do, you are NOT authorized to share my Account information, with the Permitted Party, regarding the use of my Account. If my Account information changes, which may include my billing address, I do NOT authorize you to provide this updated information to any such Permitted Party unless I give consent. I will contact the Permitted Party directly in regard to my Account.

Finally, I would like to briefly explain the above amended terms. The purpose of this notice is to provide clarity to both parties of all TILA disclosures that govern all Consumer Credit Transactions. All terms amended were harmful and not beneficial to my principal. Most of the terms violated my Consumer rights and therefore needed to be redressed. The information provided in this notice is governed by federal law and is intended to be enforced. On behalf of my principal, I am still open to negotiating if you find any of the information provided in this notice to be false, inaccurate, or misleading. Please send in writing any additional correspondence in regard to my Account to the address I provided above. I appreciate and look forward to our continued business relationship. Before I conclude this notice I would like to reference one last law: Bill of Exchange Act Part 2

21 Delivery

(1) Every contract on a bill, whether it be the drawer's, the acceptor's, or an indorser's, is incomplete and revocable, until delivery of the instrument in order to give effect thereto.

> Provided that where an acceptance is written on a bill, and the drawee gives notice to or according to the directions of the person entitled to the bill that he has accepted it, the acceptance then becomes complete and irrevocable.

(2) As between immediate parties, and as regards a remote party other than a holder in due course, the delivery—

(a) in order to be effectual must be made either by or under the authority of the party drawing, accepting, or indorsing, as the case may be:

(b) may be shown to have been conditional or for a special purpose only, and not for the purpose of transferring the property in the bill.

But if the bill be in the hands of a holder in due course a valid delivery of the bill by all parties prior to him so as to make them liable to him is conclusively presumed.

(3) Where a bill is no longer in the possession of a party who has signed it as drawer, acceptor, or indorser, a valid and unconditional delivery by him is presumed until the contrary is proved.

Sign: *Jorda Talley-Smith*

(Exhibit F)

Account Number #### #### #### 3753

JORDAN TALLEY-SMITH
4436 Torrence Ave
Hammond, IN. 46327
Email: talleysmithj@yahoo.com
Phone Number: 708-639-0828
Date: 6/3/24

**Filed in Clerk's Office**

Martha McGuire
Director Board of Directors
Transportation Alliance Bank
4185 Harrison Blvd Ste 200
Ogden, UT 84403

JUN 21 2024

Michael A. Brown
CLERK LAKE CIRCUIT COURT

## NOTICE OF ASSESSMENT

Dear board member or members of TAB Bank, I am writing this notice to give an assessment of the breach in fiduciary duty I have received from your corporation or corporation your corporation issues credit cards to pursuant to Federal Reserve Act Section 29(e). In May of 2021 I submitted an application to Mission Lane LLC in return for a line of credit issued by TAB Bank. Recently I gained the capacity to understand that when I applied for the line of credit, I extended my security as collateral which secured payment on the account. I did not know at the time, but I was supposed to receive equal consideration for what I applied for pursuant to Federal Reserve Act Section 16(2). So, I am writing to inform you about the bad business and fraudulent activity I have been dealing with. Such breaches have been laid out in the 29th section of the Federal Reserve Act under tier one, tier two, and tier three violations. I have decided to opt-in to tier three violations because at this point you are knowingly in breach of your fiduciary duty and neglect to perform your contractual obligations. Due to these violations, I cannot (1) utilize the equal consideration owed to me or (2) enjoy my unalienable rights to life, liberty, and pursuit of happiness. I have sent multiple notices notifying you, as the owner or on behalf of the owner, what to do with the account and still you neglect your fiduciary duties. My first notice of instructions, along with my remittance coupon, was delivered to Mission Lane Remittance Department on April 25th, 2024. My second notice of instructions was delivered to Mission Lane Remittance Department on May 9th, 2024, along with a few amended terms that were delivered to the Billing Inquiries and Correspondence address listed on the billing statement. My third notice of instructions was delivered as a default judgement to Mission Lane Remittance Department on May 28, 2024. All documents were sent to addresses specified on the billing statement.

# Fee Schedule for Violations

The proceeding chart is a fee schedule pursuant to Federal Reserve Act Section 29 depicting each tier, the daily mount of each tier, number of days for which violations continue, and the total amount accrued over that time.

| Violation Tier | Daily Amount | Number or days | Total Amount |
|---|---|---|---|
| 1 | $5,000 | 10 | $50,000 |
| 2 | $25,000 | 22 | $550,000 |
| 3 | $1,000,000 | 27 | $27,000,000 |

Sign: *Jordan Talley-Smith*

**Filed in Clerk's Office**

Prepared by Jordan Talley-Smith, 4436 Torrence Ave, Hammond, Indiana 46327

JUN 21 2024

*Michael A. Brown*
CLERK LAKE CIRCUIT COURT

## *DURABLE POWER OF ATTORNEY*

I, Jordan Talley-Smith, residing at 4436 Torrence Ave, Hammond, Indiana 46327, hereby appoint Jordan Talley-Smith of 4436 Torrence Ave, Hammond, Indiana 46327, as my attorney-in-fact ("Agent") to exercise the powers and discretions described below.

This Power of Attorney shall not be affected by my subsequent incapacity.

I hereby revoke any and all general powers of attorney and special powers of attorney that previously have been signed by me.

My Agent shall have full power and authority to act on my behalf. This power and authority shall authorize my Agent to manage and conduct all of my affairs and to exercise all of my legal rights and powers, including all rights and powers that I may acquire in the future. My Agent's powers shall include, but not be limited to, the power to:

1. Open, maintain or close bank accounts (including, but not limited to, checking accounts, savings accounts, and certificates of deposit), brokerage accounts, retirement plan accounts, and other similar accounts with financial institutions.

   a. Conduct any business with any banking or financial institution with respect to any of my accounts, including, but not limited to, making deposits and withdrawals, negotiating or endorsing any checks or other instruments with respect to any such accounts, obtaining bank statements, passbooks, drafts, money orders, warrants, and certificates or vouchers payable to me by any person, firm, corporation or political entity.

   b. Add, delete or change beneficiaries to any financial accounts I own including insurance policies, annuities, retirement accounts, payable on death savings or checking accounts or other investments.

   c. Perform any act necessary to deposit, negotiate, sell or transfer any note, security, or draft of the United States of America, including U.S. Treasury Securities.

   d. Have access to any safe deposit box that I might own, including its contents.

2. Provide for the support and protection of myself, my spouse, or of any minor child I have a duty to support or have established a pattern of prior support, including, without limitation, provision for food, lodging, housing, medical services, recreation and travel.

3. Sell, exchange, buy, invest, or reinvest any assets or property owned by me. Such assets or property may include income producing or non-income producing assets and property.

4. Purchase and/or maintain insurance and annuity contracts, including life insurance upon my life or the life of any other appropriate person.

5. Take any and all legal steps necessary to collect any amount or debt owed to me, or to settle any claim, whether made against me or asserted on my behalf against any other person or entity.

6. Enter into binding contracts on my behalf.

7. Exercise all stock rights on my behalf as my proxy, including all rights with respect to stocks, bonds, debentures, commodities, options or other investments.

8. Maintain and/or operate any business that I may own.

9. Employ professional and business assistance as may be appropriate, including attorneys, accountants, and real estate agents.

10. Sell, convey, lease, mortgage, manage, insure, improve, repair, or perform any other act with respect to any of my property (now owned or later acquired) including, but not limited to, real estate and real estate rights (including the right to remove tenants and to recover possession). This includes the right to sell or encumber any homestead that I now own or may own in the future.

11. Prepare, sign, and file documents with any governmental body or agency, including, but not limited to, authorization to:

    a. Prepare, sign and file income and other tax returns with federal, state, local, and other governmental bodies.

    b. Obtain information or documents from any government or its agencies, and represent me in all tax matters, including the authority to negotiate, compromise, or settle any matter with such government or agency.

     c. Prepare applications, provide information, and perform any other act
      reasonably requested by any government or its agencies in connection with
      governmental benefits (including medical, military and social security
      benefits), and to appoint anyone, including my Agent, to act as my
      "Representative Payee" for the purpose of receiving Social Security benefits.

12. Make gifts from my assets to members of my family and to such other persons or
charitable organizations with whom I have an established pattern of giving (or if it is
appropriate to make such gifts for estate planning and/or tax purposes), to file state
and federal gift tax returns, and to file a tax election to split gifts with my spouse, if
any. No Agent acting under this instrument, except as specifically authorized in this
instrument, shall have the power or authority to (a) gift, appoint, assign or designate
any of my assets, interests or rights, directly or indirectly, to such Agent, such Agent's
estate, such Agent's creditors, or the creditors of such Agent's estate, (b) exercise any
powers of appointment I may hold in favor of such Agent, such Agent's estate, such
Agent's creditors, or the creditors of such Agent's estate, or (c) use any of my assets to
discharge any of such Agent's legal obligations, including any obligations of support
which such Agent may owe to others, *excluding* those whom I am legally obligated to
support.

13. To transfer any of my assets to the trustee of any revocable trust created by me, if
such trust is in existence at the time of such transfer.

14. To utilize my assets to fund a trust not created by me, but to which I have either
established a pattern of funding, or to fund a trust created by my Agent for my
benefit or the benefit of my dependents, heirs or devisees upon the advice of a
financial adviser.

15. To create, sign, modify or revoke any trust agreements or other trust documents in
an attempt to manage or create a trust that was created for my benefit or the benefit
of my dependents, heirs or devisees. This shall include the creation, modification
or revocation of any inter vivos, family living, irrevocable or revocable trusts.

16. Subject to other provisions of this document, my Agent may disclaim any interest,
which might otherwise be transferred or distributed to me from any other person,
estate, trust, or other entity, as may be appropriate. However, my Agent may not
disclaim assets to which I would be entitled, if the result is that the disclaimed
assets pass directly or indirectly to my Agent or my Agent's estate. Provided that
they are not the same person, my Agent may disclaim assets which pass to my Gift
Agent, and my Gift Agent may disclaim assets which pass to my Agent.

17. Have access to my healthcare and medical records and statements regarding
billing, insurance and payments.

This Power of Attorney shall be construed broadly as a General Power of Attorney. The listing of specific powers is not intended to limit or restrict the general powers granted in this Power of Attorney in any manner.

Any power or authority granted to my Agent under this document shall be limited to the extent necessary to prevent this Power of Attorney from causing, (i) my income to be taxable to my
Agent, (ii) my assets to be subject to a general power of appointment by my Agent, or (iii) my Agent to have any incidents of ownership with respect to any life insurance policies that I may own on the life of my Agent.

My Agent shall not be liable for any loss that results from a judgment error that was made in good faith. However, my Agent shall be liable for willful misconduct or the failure to act in good faith while acting under the authority of this Power of Attorney. A Successor Agent shall not be liable for acts of a prior Agent.

No person who relies in good faith on the authority of my Agent under this instrument shall incur any liability to me, my estate or my personal representative. I authorize my Agent to indemnify and hold harmless any third party who accepts and acts under this document.

If any part of any provision of this instrument shall be invalid or unenforceable under applicable law, such part shall be ineffective to the extent of such invalidity only, without in any way affecting the remaining parts of such provision or the remaining provisions of this instrument.

My Agent shall be entitled to reasonable compensation for any services provided as my Agent. My Agent shall be entitled to reimbursement of all reasonable expenses incurred as a result of carrying out any provision of this Power of Attorney.

My Agent shall provide an accounting for all funds handled and all acts performed as my Agent as required under state law or upon my request or the request of any authorized personal representative, fiduciary or court of record acting on my behalf.

This Power of Attorney shall become effective immediately, and shall not be affected by my disability or lack of mental competence, except as may be provided otherwise by an applicable state statute. This is a Durable Power of Attorney. This Power of Attorney shall continue effective until my death. This Power of Attorney may be revoked by me at any time by providing written notice to my Agent.

**[SIGNATURE PAGE FOLLOWS]**

Dated October 31, 2023, at Hammond, Indiana.

Jordan Talley-Smith
Jordan Talley-Smith

STATE OF INDIANA,
COUNTY OF LAKE, ss:

This instrument was acknowledged before me on this 31 day of
October, 2023 by Jordan Talley-Smith.



Jessenia A. Johnson
Notary Public

Jessenia A. Johnson
My commission expires  08-21-2031
Notice to Person Executing Power of
Attorney:

A Power of Attorney is an important legal document. By signing the Power of Attorney,
you are authorizing another person to act for you, the principal. Before you sign this Power
of Attorney, you should know these important facts:

Your Agent (attorney-in-fact) has no duty to act unless you and your Agent agree
otherwise in writing.

This document gives your Agent the powers to manage, dispose of, sell and convey
your real and personal property, and to use your property as security if your Agent
borrows money on your behalf, unless you provide otherwise in this Power of Attorney.

Your Agent will have the right to receive reasonable payment for services provided
under this Power of Attorney unless you provide otherwise in this Power of Attorney.

The powers you give your Agent will continue to exist for your entire lifetime, unless you state that the Power of Attorney will last for a shorter period of time or unless you otherwise terminate the Power of Attorney. The powers you give your Agent in this Power of Attorney will continue to exist even if you can no longer make your own decisions respecting the management of your property, unless you provide otherwise in this Power of Attorney.

You can change or correct the terms of this Power of Attorney only by executing a new Power of Attorney, or by executing an amendment through the same formalities as an original. You have the right to revoke or terminate this Power of Attorney at any time, so long as you are competent.

This Power of Attorney must be dated and must be acknowledged before a notary public or signed by two witnesses. All witnesses must be mentally competent and they must witness the principal's signing of the Power of Attorney or (2) the principal's signing or acknowledgment of his or her signature. A Power of Attorney that may affect real property should be acknowledged before a notary public so that it may easily be recorded.

You should read this Power of Attorney carefully. When effective, this Power of Attorney will give your Agent the right to deal with property that you now have or might acquire in the future. The Power of Attorney is important to you. If you do not understand the Power of Attorney, or any provision of it, then you should obtain the assistance of an attorney or other qualified person.

**Notice to Person Accepting the Appointment as Attorney-in-Fact:**

By acting or agreeing to act as the Agent (attorney-in-fact) under this Power of Attorney, you assume the fiduciary and other legal responsibilities of an Agent. These responsibilities include:

1.  The legal duty to: act solely in the interest of the principal; act loyally, with care, competence, and diligence; and avoid conflicts of interest.

2.  The legal duty to keep a record of all transactions made on behalf of the principal, including the responsibility to produce receipts, ledgers and other records of all deposits, disbursements or other transactions involving the principal's assets or indebtedness.

3.  To cooperate with the principal's Agent for health care decisions, should the principal appoint such an Agent, in making decisions in accordance with the principal's desires or in the best interest of the principal if the principal's wishes are not known.

4. The legal duty to preserve the principal's estate plan, if one exists, and the principal's desires for such plan to be preserved.

5. The legal duty to keep the principal's property separate and distinct from any other property owned or controlled by you.

6. The legal duty to terminate actions as Agent (Attorney-in-Fact) under this Power of Attorney upon the occurrence of any of the following:

   a. Principal's death;
   b. Revocation of the Power of Attorney of principal;
   c. The arrival of any date stated in the Power of Attorney, which states the termination of the
   Power of Attorney, if any; or
   d. No additional action is required under the Power of Attorney.

7. If you are the spouse of the principal, the Power of Attorney terminates upon legal separation or dissolution of the marriage.

8. You may be held responsible and liable for any intentional actions which violate or abuse your authority under this Power of Attorney as provided by the state and federal laws governing this Power of Attorney.

9. You have the right to seek legal advice if you do not understand your duties as Agent or any provisions in the Power of Attorney.

You may not transfer the principal's property to yourself without full and adequate consideration or accept a gift of the principal's property unless this Power of Attorney specifically authorizes you to transfer property to yourself or accept a gift of the principal's property. If you transfer the principal's property to yourself without specific authorization in the Power of Attorney, you may be prosecuted for fraud and/or embezzlement. If the principal is 65 years of age or older at the time that the property is transferred to you without authority, you may also be prosecuted for elder abuse. In addition to criminal prosecution, you may be sued in civil court.

I have read the foregoing notice and I understand the legal and fiduciary duties that I assume by acting or agreeing to act as the Agent (attorney-in-fact) under the terms of this Power of Attorney.

Date: 10 / 31 / 23

Signed: *Jorda Talley-Smith*

Jordan Talley-Smith

This document was prepared by: Jordan Talley-Smith